UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CHARLES CHU,                                              :
                                                                    07 Civ. 6684 (RJS) (DF)
                              Petitioner,                 :

            -against-                                     :         **REPORT AND**
                                                                    **RECOMMENDATION**
DALE ARTUS, Superintendent,                              :
Clinton Correctional Facility,
                                                         :
                              Respondent.
------------------------------------------------------------X

**TO THE HONORABLE RICHARD J. SULLIVAN, U.S.D.J.:**

        *Pro se* petitioner Charles Chu ("Petitioner") seeks a writ of habeas corpus pursuant to

28 U.S.C. § 2254, following his state conviction, upon a jury verdict, of Murder in the Second

Degree, in violation of N.Y. Penal Law § 125.25[1]; Conspiracy in the Second Degree, in

violation of N.Y. Penal Law § 105.15; and Criminal Sale of a Controlled Substance in the Third

Degree, in violation of N.Y. Penal Law § 220.39[1].  Petitioner is incarcerated at the Clinton

Correctional Facility.

        In this proceeding, Petitioner raises a number of separate grounds for habeas relief.  (*See*

Memorandum of Law in Support of Habeas Corpus Petitioner, dated Jan. 1, 2008 (Dkt. 9)

("Amended Petitioner" or "Am. Pet.").)  The Superintendent of the Clinton Correctional Facility

("Respondent")[1] argues that the Amended Petition should be dismissed in its entirety, on the

grounds that the claims are unexhausted, procedurally barred, not cognizable and/or without

merit.  (*See* Memorandum of Law in Opposition to Petition, dated Mar. 7, 2008 (Dkt. 13)

("Resp. Mem.").)  For the reasons discussed below, I recommend that certain of Petitioner's

_____

        [1] In a letter dated July 13, 2011, Petitioner states that the current Superintendent of the
Clinton Correctional Facility is "T. Lavalley."  (Dkt. 33.)

claims, which have not been fully exhausted in the state courts, be deemed to be excised from his Amended Petition, and that the remainder of his claims be dismissed as either procedurally barred or without merit.

## FACTUAL BACKGROUND

Based on the evidence presented by the prosecution at trial,[2] between August 1989 and June 1997, Petitioner was a member of a drug-selling organization, the Champion Crew (the "Crew"), working his way up in the organization from street salesman to manager.  (*See* Trial Tr. at 3000-01, 3502; *see also id.* at 226-32.)  The Crew was founded by Petitioner's uncle, Geoffrey Rodriguez ("Rodriguez") and Peter Chin ("Chin") in the late 1980s.  (*See id*. at 2945-53, 3125-32, 3372-80.)  The Crew began by selling cocaine out of the Champion Pool Hall near Avenue C and 8th Street, in Manhattan, but later expanded to other locations in Manhattan, Brooklyn, the Bronx and beyond, and switched from selling cocaine to "trademarked" brands of heroin.  (*See id.* at 1189-97, 2955-57, 2970.)  The Crew's operations led to the multiple shootings and killings, including the murder of William Rodriguez ("William").  (*See id*.)

The trial of Petitioner and his three co-defendants (Rodriguez and two other members of the Crew) was lengthy.  The evidence presented by the prosecution, including the facts underlying the drug conspiracy, is aptly described in a March 15, 2004 Report and Recommendation by the Honorable Andrew J. Peck, U.S.M.J., recommending the denial of a

---

[2]  The transcripts of the proceedings before the state trial court are assembled in chronological order, in eight separate volumes.  The first volume (Dkt. 14) contains transcripts of voir dire, conducted on June 2 through 9, 1998 ("Voir Dire Tr.") and June 10, 1998 ("2d Voir Dire Tr.").  The second through eighth volumes (Dkts. 15-21) contain the transcript of the trial, conducted June 11 through July 21, 1998 ("Trial Tr.").  The eighth volume (Dkt. 21) also contains the transcript of Petitioner's sentencing, conducted on September 9, 1998 ("Sentencing Tr.").

habeas petition by Rodriguez, in which he challenged his conviction and sentence.  *See Rodriguez v. Senkowski*, No. 03 Civ. 3314 (LAP) (AJP), 2004 WL 503451 (S.D.N.Y. Mar. 15, 2004) (Report & Recommendation), *adopted by* Order, dated Mar. 15, 2004 (Dkt. 37).  The facts will be addressed by this Court below, only to the extent necessary to consider the particular claims being raised by Petitioner in this proceeding.

### A.    Drug Sales at the Fourth Street Location

In the 1990s, the Crew controlled a heroine-selling location on East Fourth Street and Avenue B (the "Fourth Street location").  (Trial Tr., at 1903-05.)  Sales were made from the hallway of 231 East Fourth Street, where police officers frequently found hypodermic needles and empty glassine bags.  (*Id*. at 541-42, 552-53.)  In connection with an ongoing investigation of narcotics activity and accompanying violence on the Lower East Side (and, in particular, the activities of the Crew), the New York City Police Department and the District Attorney's Office secured from the landlord of 231 East Fourth Street a trespass affidavit, which stated that no one but an occupant or a guest had a right to be inside.  (*Id*. at 510-22, 552-53, 558.)  The police conducted surveillance of the Fourth Street location and frequently arrested people who were carrying drugs in or near the building.  (*Id.*)

On the evening of July 21, 1995, Police Officer Terrence Curran observed Petitioner enter and exit 231 East Fourth Street approximately eight times, each time remaining in the building for a minute or two.  (*Id*. at 1860-61, 1870.)  Some of those times, Petitioner entered and exited the building by himself.  (*Id*.)  Most of the time, however, Petitioner was first approached by an individual, with whom he would then enter the building; a few minutes later, they would exit together, after which the individual would leave.  (*Id*. at 1861-62.)  One of those individuals was Bridgett Hull ("Hull"), and, based on a radio description provided by

Officer Curran, another police officer stopped Hull, who was found to be carrying four glassines of heroin stamped "Original." (*Id*. at 1863-64, 1877.)

Later that evening, Officer Curran approached Petitioner and asked him what he was doing at 231 East Fourth Street. (*Id*. at 1866.) Petitioner responded that he had not been in the building. (*Id*. at 1867.) When pressed by Officer Curran, Petitioner stated that he was looking for a woman named "Tiffany," but he was unable to provide her last name or the apartment or floor where she lived. (*Id*. at 1866-68, 1877-80, 1882.) Officer Curran arrested Petitioner, who was in possession of $800. (*Id*. at 1880, 1882-83.)

### B.   **Murder of William**

At some point in 1995, William, in addition to working at the Fourth Street location on behalf of the Crew, also began to sell his own cocaine and heroin at that location. (*Id*. at 1903-05.) William also began "hanging around" with a rival group of neighborhood drug dealers. (*Id*. at 3004-05.) Later in 1995, Rodriguez and Petitioner made a delivery of heroin to the Fourth Street location's daily stash house, and, in the safe that was kept there, they discovered cocaine that they learned belonged to William. (*Id*. at 1905-08.) In addition, in late 1995 or early 1996, Rodriguez and Chin began to complain that the amount of money being turned over to them from the Fourth Street location had dropped drastically, and they began to suspect that William was either selling his own heroin or tampering with their drugs. (*Id*. at 2460-62, 3306-08.) To confirm their suspicions, Chin occasionally had someone purchase drugs at the Fourth Street location, and he found that these drugs were not the drugs that he and Rodriguez were selling. (*Id*. at 2462-63.)

In late 1995 or January 1996, Jehu Morales ("Morales"), a Crew member, saw Petitioner and another member of the Crew speaking to William. When Morales came back 10 to 15

4

minutes later, William was gone, and Petitioner was yelling, "That motherfucker. . . He is going to get his." (*Id*. at 2228, 2302-05.) Also around that time, William frequently complained that Chin owed him around $13,000 and was not paying it back, and had many arguments with Chin. (*Id*. at 1424-26, 1502-03, 1768-70.) Eventually, Chin and Rodriguez "fired" William, after which the amount of money being turned over from the Fourth Street location increased. (*Id*. at 2462-64, 3309.) William continued to deal drugs at a location at Third Street and Avenue B and continued to complain that Rodriguez and Chin owed him money. (*Id*. at 1908.)

Two or three times, William and a man known as "Fat Tony" returned to the Fourth Street location and threatened and shot at Crew workers. (*Id*. at 1427-28, 3007-09.) In response, Rodriguez, Chin, Petitioner and another member of the Crew armed themselves and went to the Fourth Street location, but could not find William. (*Id*. at 3008.) Chin told his brother, Tony Chin ("Tony"), that, with respect to William, Chin was going to "put a stop to all of this." (*Id*. at 2636-37.)

Shortly thereafter, William told Anibal Rosa ("Rosa") that he was planning to rob the Fourth Street location's stash house on a particular day at 9:30 p.m., and warned Rosa not to be around. (*Id*. at 1429-31, 1503-06.) That night, Charles "Tank" Davis ("Davis"), the shift manager of the Fourth Street location, went to the stash apartment, where he found Petitioner and Ruby Colon handcuffed to the refrigerator. (*Id*. at 1431-32, 1505, 1910-13, 1945-46.) Petitioner called Rodriguez and Chin, and, when they arrived, Petitioner told them that two armed men in masks had entered the apartment and taken the safe containing drugs and money. (*Id*. at 1913-14, 2466.) Petitioner, Rodriguez and Chin believed that William was responsible. (*Id*.) Rodriguez and Chin vowed to get their money and drugs back. (*Id*. at 1913-14.)

William visited Rosa later that same night and asked Rosa to help repackage the stolen drugs, which Rosa did.  (*Id*. at 1429-30.)  William told Rosa about the robbery:  William said that, near closing time, he had waited in his car while his two friends went into the stash house and robbed it.  (*Id*. at 1429-33.)  Rosa told William that he would have to kill Rodriguez and Chin or else Rodriguez and Chin would kill him and Rosa; William replied that he could not shoot Rodriguez or Chin. (*Id*. at 1436.)

After the robbery, Petitioner began to carry a gun and said that he wanted to get William. (*Id*. at 2465-67.)  Rodriguez and Chin's original plan was "to kill all of" the people involved in the stash house robbery, but they eventually decided just to kill William because "he [was] the one that knew everything about us."  (*Id*. at 3014.)  Rodriguez, Chin and Petitioner drove around the neighborhood looking for William, and, whenever Tony saw William, Tony would page Rodriguez or Chin to alert them that William was in the area.  (*Id*. at 2468, 3015.)

On January 30, 1996, Petitioner and Chin "met up" and rented a Lincoln Town Car.  (*Id*. at 3018.)  Chin and Petitioner picked up another member of the Crew, Carlos Cruz ("Cruz"), and drove to the Lower East Side to look for William.  (*Id*. at 3019.)  They spotted William's gold Mercury parked in front of his home at 749 FDR Drive.  (*Id*. at 3019-20.)  They drove to Brooklyn to pick up Rodriguez (who had paged Petitioner), and returned to 749 FDR Drive to wait for William to come down to the street.  (*Id*. at 3020.)  Concerned that William, when he emerged from the building, would be able to escape in his car, Cruz slashed the front driver's side tire on William's car.  (*Id*. at 3022-24.)

Meanwhile, Rosa had telephoned William and agreed to pick him up at 749 FDR Drive, where Rosa's mother was also living at the time.  (*Id*. at 1436-39.)  Rosa went up to his mother's apartment and, on his way out of the building, noticed William's flat tire.  (*Id*. at 1438.)  Rosa

6

drove to Fifth Street and Avenue D to use the phone to call William.  (*Id*.)  Thinking that perhaps

the flat tire was a trap, Rosa told William not to come downstairs until Rosa had beeped his

horn.  (*Id*. at 1436-39, 1803.)

Rodriguez, Chin, Petitioner and Cruz, after leaving for a short time to eat, returned to

749 FDR Drive and saw William fixing his tire.  (*Id*. at 3024-25.)  They drove around the corner,

where Chin and Cruz entered a Mustang that was parked there, leaving Rodriguez and Petitioner

in the rental car.  (*Id*. at 3025-26.)  Both cars circled back to 749 FDR Drive with the Mustang in

the lead; Rodriguez and Petitioner followed in order to "back [Chin] up" and make sure that

"nobody could come between the car[s] to see what [Chin] was going to do."  (*Id*. at 3025-27.)

Chin shot William four or five times using his nine millimeter pistol.  (*Id*. at 3027.)  Chin and

Cruz then drove to City Island, where Cruz disassembled the gun and threw it in the water.  (*Id*.

at 3027-28.)  Chin and Cruz met back up with Rodriguez and Petitioner at Cruz's apartment.  (*Id*.

at 3028.)[3]

Later that night, Rosa and a number of his friends pulled guns on Morales, who was

managing a location at 11th Street between Avenues B and C, in Manhattan.  (*Id*. at 1440-42,

1516-19, 2250-56, 2258, 2268.)  The men kept telling Morales to "tell Nelson[4] and Tony that

they was [*sic*] going to get theirs" because they had killed "their boy Will."  (*Id*. at 2251-52.)  As

Rosa and his friends began to leave, one of them said, "we didn't come here for nothing."  (*Id*.

---

[3] Police Officer Timothy Kane and his partner arrived at the scene of the shooting at
about 11:25 p.m., in response to a radio report of shots being fired.  (*Id*. at 1587.)  A crowd of
about 15 people had gathered, and Rosa's red car was double-parked on the service road.  (*Id*. at
1587-88, 1594.)  William was lying face-up on the ground next to a gold four-door Mercury
sedan; a gunshot wound was visible at the back of his head.  (*Id*. at 1588-94.)

[4] Nelson Trujillo (hereinafter "Trujillo") was another member of the Crew.  (Trial Tr.,
at 2420-21, 2428-30.)

at 2252.)  One of the men then punched Morales in the face and, when Morales looked back, shot Morales in the thigh.  (*Id*. at 2253-54.)  As Morales tried to run, the same man shot Morales in his left kneecap.  (*Id*. at 2254; *see also id*. at 1442-43, 1516-18, 1542-43, 1808-11, 1840.)  Rosa and his friends fled.  (*Id*. at 1443, 1519, 1543-44, 1811.)

At the direction of Chin and Trujillo, a number of members of the Crew assembled, including Petitioner, Tony, David Rodriguez ("David"), Anthony Arenas ("Arenas") and Dubel "Doobie" Rodriguez ("Doobie").  (*Id*. at 1131-32, 1141, 2471, 2846, 2850, 2896-97.)  Petitioner had cut off all or almost all of his hair, had shaved off his goatee, mustache and sideburns, and was shaking and nervous.  (*Id*. at 1137-39, 1334-35, 2853, 2904-09.)  Petitioner asked after Morales, and Doobie responded that Morales had been shot in the legs, but was all right.  (*Id*. at 2850.)  Doobie asked, "What happened?" and Petitioner replied, "The shit fucked up, it wasn't supposed to go down like that."  (*Id*. at 2851.)  Doobie told Petitioner, "I hope you didn't do what I think you all did."  (*Id*.)  Petitioner asked what Doobie thought had happened, and Doobie responded, "The Will situation."  (*Id*. at 2852.)  Petitioner replied repeatedly, "You know that nigger violated."  (*Id*. at 2852-53, 2897-99, 2909-10.)  Trujillo added, "The shit was fucked up."  (*Id*. at 2897-98.)  The group remained in the garage for about two hours.  (*Id*. at 2853.)

Within a few days of the shooting, Petitioner, Chin, Rodriguez and Cruz discussed William's murder.  According to Chin, Petitioner said that "it had to happen" because there "were a lot of problems going on and these guys were looking to try to hurt us," and Rodriguez said "basically about the same thing."  (*Id*. at 3059-60.)  Cruz told Tony what had happened on the night of William's murder – specifically, that they had been looking for William in the Mustang, that Rodriguez and Petitioner were behind them in the Town Car, and that Chin had shot William.  (*Id*. at 2600-02, 2634-35.)  Petitioner also told Tony what had happened that

8

night, saying "we smoked him."  (*Id*. at 2724.)  About two weeks after William's murder,

Rodriguez, Chin and Petitioner arranged to speak to Davis, who had been a friend of William's.

(*Id*. at 1915.)  According to Davis, Chin kept telling him "I'm sorry," but "it had to happen," and

Rodriguez added that William knew too much and, thus, "[w]e had to get him before he got us."

(*Id*. at 1916.)

## PROCEDURAL HISTORY

On May 23, 1997, Petitioner and 47 other co-defendants were indicted by a grand jury on

a 54-count indictment.  At that time, Petitioner was charged with Conspiracy in the Second

Degree and two counts of Criminal Sale of a Controlled Substance in the Third Degree.  About a

year later, on April 24, 1998, Petitioner, Rodriguez, Chin, Tony and Trujillo were indicted for

Murder in the Second Degree, in connection with William's murder.

The indictments were consolidated for trial, over objection by Petitioner's pre-trial

counsel, Patrick J. Brackley, Esq.  All of the defendants, except for Petitioner, Rodriguez,

Manuel Guzman Hernandez ("Hernandez") and David, entered guilty pleas.  On May 15, 1998,

three and a half weeks before trial commenced, Richard Siracusa, Esq. ("Siracusa") was

substituted as trial counsel for Petitioner.

### A.    Voir Dire

On June 2, 1998, jury selection began before the Honorable Leslie Crocker Snyder,

J.S.C., for the trial of Petitioner and co-defendants Rodriguez, Hernandez and David.  (Voir Dire

Tr., at 1.)  On June 9, 1998, the attorneys began making their challenges.  (*Id*. at 376-77.)  Of the

first 20 prospective jurors (taken in groups of 12 and eight), the prosecution used peremptory

challenges against five, including one black and three Hispanic individuals.  (*See id*.)  The

defense jointly used five peremptory challenges as to the first group of 12 prospective jurors,

including three white men.  (*See id.*)  Prior to addressing the second group of eight prospective jurors, though, the defense raised a *Batson* objection,[5] arguing that the prosecution's challenge to the only three Latinos in the pool established a *prima facie* case of purposeful discrimination. (*Id*. at 378.)  Justice Snyder found that, while it was not "entirely clear," the defense had "probably" raised sufficient facts to support an inference that the prosecutor had used her peremptory challenges "for discriminating purposes," and asked the prosecution to explain the bases for its challenges.  (*Id*. at 380.)  After the prosecution provided explanations, Justice Snyder denied the *Batson* motion:

> I will find that pursuant to the *Batson* steps and pro[geny] the defendants did probably raise sufficient facts where there is an inference that you used your peremptories for discriminating purposes.  I don't think that is entirely clear.  Even if the burden shifts to you at stage two, I could state that you have given two other legitimate reasons for striking the first two of the three jurors.  I do not find any of the reasons are [pretextual].  Your motion is denied. . . .

(*Id*. at 378-80.)  Justice Snyder noted, "[h]owever, I take the *Batson* issue most seriously.  I would suggest that the prosecution do as well." (*Id*. at 380.)

The defense then challenged five prospective jurors from the second group of eight, including two white men.  (*Id*. at 380.)  At that point, five jurors had been selected.  The prosecution raised a so-called "reverse-*Batson*" objection regarding the defense's challenges of five white males.  (*Id*. at 381.)  Justice Snyder "tentatively" held that the burden shifted to the defense.  (*Id*. at 381-82.)  The defense responded by explaining their reasons for striking the

---

[5] In *Batson v. Kentucky*, 476 U.S. 79, 84 (1986), the Supreme Court reaffirmed the proposition that a state's purposeful exclusion of jurors on the basis of their race violates the Equal Protection Clause.

white male prospective jurors.  (*Id*. at 382-85.)  Justice Snyder found the defense's reasons to be weak, but reserved ruling until the following day.  (*Id*. at 384-85.)

The court next heard challenges to 12 venire persons, in groups of seven and five.  As to these 12, the prosecution exercised five peremptory challenges, including two black women; and the defense struck five prospective jurors, including two white mem.  (*Id*.)  The prosecution pointed out that one of the struck jurors "[was] a white male."  (*Id*. at 388.)  Justice Snyder stated that the defense "appeared to be engaging in [a pattern of] discriminatory strikes" aimed at white males, and that she was going to keep all of the prospective jurors pending further argument on the *Batson* issue the next day.  (*Id*.)

From the next five venire persons, the prosecution exercised two peremptory challenges, including a black woman and a Hispanic woman.  (*Id*. at 389.)  Before defense counsel could raise any objection to the challenge to the Hispanic woman, Justice Snyder noted that she would "consider *Batson* against each side tomorrow after [she] hear[d] further allegations by both sides," and that she was "also observing any patterns."  (*Id*.)  The prosecution supported its peremptory challenge of the Hispanic woman by stating that she was "the woman who told us when she was first questioned by [Justice Snyder] that her husband was convicted in a drug conspiracy case."  (*Id*. at 390.)  Justice Snyder stated that "seem[ed] like a pretty good reason to me . . . .  I normally would have struck her myself at that point."  (*Id*.)  The defense did not exercise any peremptory challenges, resulting in 10 selected jurors.  (*Id*. at 389-90.)

The remaining members of the venire panel were then considered one or two at a time. The prosecution challenged three prospective jurors, including two black individuals; the defense challenged two prospective jurors, including a white man.  (*Id*. at 390-91.)  Jury selection concluded for the day with 11 selected jurors.  (*Id*. at 391-92.)  Justice Snyder stated

that she would address the *Batson* applications from both sides the following day, declined to swear in any of the selected jurors, and ordered all prospective jurors to return.  (*Id*. at 392.)

On June 10, 1998, Justice Snyder addressed the parties' *Batson* applications.  (*See* 2d Voir Dire Tr.)  Justice Snyder explained that the defense had made a *prima facie Batson* case based on the prosecution striking Hispanic prospective jurors and, thus, the burden of going forward shifted to the prosecutor to set forth her reasons for the challenges.  (*Id*. at 4-6.)  Justice Snyder then found the reasons given by the prosecutor for striking each of the Hispanic prospective jurors were "legitimate and race-neutral."  (*Id*. at 6.)  In particular, Justice Snyder held that all but one of the explanations were "highly substantive," and the remaining reason, while "more reactive than substantive," was "race-neutral and legitimate" nonetheless.  (*Id*.)  Justice Snyder explained that the ultimate burden of persuasion thus shifted back to the defense, and held that the defense had failed to meet that burden, as the prosecutor's reasons were "legitimate," "nonpretextual" and race neutral.  (*Id*.)  Justice Snyder therefore refused to reseat any of the Hispanic venire persons who were stricken by the prosecution.  (*Id*.)

Defense counsel moved to expand its *Batson* argument to assert that the prosecution struck 11 of 13 "minority" venire members, which the defense defined as Hispanics and African-Americans.  (*Id*. at 7-6.)  Justice Snyder denied the request that she reconsider her ruling as to the Hispanic venire members, stating that she was "overwhelmingly satisfied" as to the non-pretextual nature of those challenges, but asked the prosecutor to explain her challenges to the African-American venire members.  (*Id*. at 10.)  The prosecutor provided explanations.  (*Id*. at 33-34.)  Defense counsel did not respond to the prosecutor's explanations as to each individual venire person; rather, the defense relied solely on the fact that, of the 13 minority venire members on the 44-member venire panel, 10 were struck by the prosecution.  (*Id*. at 37.)

12

Justice Snyder found that, although some of the prosecutor's reasons were stronger than others, they were "substantive in nature," and the defense had not met its ultimate burden of showing that the prosecutor's strikes were race-related.  (*Id.* at 37-38.)

As to the prosecution's *Batson* challenge to the defense's striking of white male jurors, Justice Snyder found that the numbers made out a *prima facie* case and directed the defense to explain the bases for its peremptory challenges.  (*Id.* at 10.)  The defense provided explanations and, in response, the prosecution argued that those explanations were pretextual, as the concerns raised by the defense had not been applied consistently to all potential jurors and/or were insufficient under *Batson* case law.  (*Id.* at 23-24.)  Justice Snyder found that the defense had engaged in a pattern of pretextual challenges to remove white males from the jury, and had failed to offer race-neutral and non-pretextual reasons.  (*Id.* at 26-27.)  While noting that she could re-seat five of the white men struck by the defense, Justice Snyder ordered that only three be seated in the positions that they would have held, had the defense not challenged them.  (*Id.* at 29.)  After further argument, Justice Snyder, "in an exception [*sic*] of fairness to the defense," changed her prior ruling so that only two of the three would be seated, and gave the defense the choice of which of the three would be seated.  (*Id.* at 39-40.)  The defense declined to make that choice, and Justice Snyder seated two of the white men, completing the selection of the main jury.  (*Id.* at 40-41.)  The alternate jurors were selected without any *Batson* issues.

### B.    Trial

At trial, the prosecution presented the testimony of numerous witnesses, including Officer Curran, Chin, Tony, Rosa, Doobie and Arenas.  Petitioner did not testify on his own behalf or call any witnesses.  On July 21, 1998, Petitioner was convicted of murder in the second degree, conspiracy in the second degree and one count of criminal sale of a controlled substance

13

in the third degree (for the sale on July 21, 1995); the jury acquitted him of the other count of

criminal sale of a controlled substance in the third degree (for an alleged sale on

February 21, 1997).  (*Id*. at 4302-03.)  On September 9, 1998, Petitioner was sentenced to

consecutive terms of imprisonment of 25 years to life on the count of murder in the second

degree, and eight and one-third years to 25 years on each of the other two counts.  (Sentencing

Tr., at 29.)

      **C.**    **<u>Direct Appeal</u>**

      On direct appeal to New York Supreme Court, Appellate Division, Petitioner's assigned

counsel raised four claims on behalf of Petitioner, specifically (1) that the evidence that

Petitioner committed murder in the second degree was legally insufficient; (2) that Petitioner's

trial counsel was ineffective on numerous grounds; (3) that the evidence that Petitioner

committed a criminal sale of a controlled substance in the third degree was legally insufficient;

and (4) that Petitioner's sentence was excessive.  (*See* Ex. C ("Pet. App. Br.").)  In a

supplemental brief, Petitioner's counsel also raised a fifth claim that Petitioner's rights were

violated under *Batson*.  (Ex. D.)

      The Appellate Division unanimously affirmed Petitioner's conviction on

December 22, 2005.  *People v. Chu*, 808 N.Y.S.2d 179 (1st Dep't 2005) (also affirming the

conviction of Hernandez).  In pertinent part, the Appellate Division found that both of

Petitioner's legal sufficiency arguments were unpreserved, and went on to explain:

> Were we to review these claims, we would find that . . . the verdict
> was based on legally sufficient evidence . . . .  In each instance,
> there was sufficient corroboration of accomplice testimony (*see*
> N.Y. Crim. Proc. § 60.22[1]).  The evidence of [Petitioner's]
> involvement in the murder was corroborated by the testimony of
> witnesses who were accomplices in the conspiracy but not the
> murder (*see People v. Dorta*, 46 N.Y.2d 818, 820 (1978); *People v.*

14

> *Cruz*, 716 N.Y.S.2d 570 (1st Dep't 2002), *lv. denied* 97 N.Y.2d
> 752 (2002)).

*Id.*

The Appellate Division found that Petitioner's claim for ineffective assistance of trial counsel was "unreviewable on direct appeal because it involve[d] counsel's strategy and preparation, and other matters outside the record." *Id.* The court went on to state: "To the extent the existing record permits review, it establishes that Chu received effective assistance under the state and federal standards." *Id.*

In rejecting Petitioner's *Batson* claims, the Appellate Division referred to its rejection of similar *Batson* claims raised by Rodriguez in his direct appeal, *People v. Rodriguez*, 716 N.Y.S.2d 570 (1st Dep't 2000) (finding that the trial court's *Batson* rulings were "supported by the record"), and found no reason for reaching a different result as to Petitioner, *People v. Chu*, 808 N.Y.S.2d 179. The Appellate Division also found "no basis" for reducing Petitioner's sentence. *Id.* Finally, the Appellate Division stated, "Defendants' remaining contentions are unpreserved and we decline to review them in the interest of justice. Were we to review these claims, we would reject them." *Id.*

On January 18, 2006, Petitioner's appellate counsel submitted a letter on behalf of Petitioner to the Court of Appeals, enclosing the parties' briefs to the Appellate Division, but then specifically stating that Petitioner sought "review of the order and claim[ed] error as a matter of law as to" three particular holdings of that court. Specifically, the letter sought review of the Appellate Division's rejection of Petitioner's claims (1) that the trial court's *Batson* rulings were in error; (2) that Petitioner was denied effective assistance of trial counsel; and (3) that the evidence that Petitioner committed murder in the second degree was legally

15

insufficient.  (Ex. G.)  Petitioner also "respectfully request[ed] additional time to set forth [his] arguments in full."  (*Id.*)

On March 10, 2006, Petitioner's counsel then submitted a second letter to the Court of Appeals that was considerably longer (11 pages, single-spaced) and more detailed than the first. In that second letter, however, counsel reiterated only two of claims listed in the first letter as the basis for the requested review – namely Petitioner's claims (1) challenging the trial court's *Batson* rulings, and (2) asserting that Petitioner was denied effective assistance of trial counsel as to his murder conviction.  (*See* Ex. H.)  The letter contained no mention of the third claim that counsel had originally enumerated as a basis for appeal (Petitioner's claim that the evidence of murder was legally insufficient to support the verdict).  (*See id.*)  Moreover, while the letter went on to set forth extensive substantive arguments in support of Petitioner's *Batson* and ineffective-assistance claims, it omitted, with respect to the latter, certain arguments that Petitioner had raised before the Appellate Divison.  (*Compare id. with* Pet. App. Br.)

The Court of Appeals denied Petitioner leave to appeal on June 5, 2006.  *People v. Chu*, 7 N.Y.3d 753 (2006).  It does not appear that Petitioner filed a petition for writ of *certiorari* to the United States Supreme Court.

### D.     Petitioner's Application for a Writ of Error *Coram Nobis*

On April 19, 2007, Petitioner filed a *pro se* application with the Appellate Division for a writ of error *coram nobis*.  (Ex. K.)  Petitioner argued that his appellate attorney was ineffective because, on direct appeal, counsel failed to assert claims based on what Petitioner termed "prosecutorial misconduct" and "judicial misconduct."  (*See id.*)  In relevant part, Petitioner

16

argued that his appellate counsel should have raised alleged *Brady* and *Rosario* violations,[6]

based on the prosecution's failure to turn over evidence of deals made by the prosecution with

Chin and Rosa in exchange for their testimony against Petitioner and his co-defendants.  (*See id*.)

On July 19, 2007, the Appellate Division denied Petitioner's *coram nobis* application (Ex. M),

and, on November 9, 2007, the New York Court of Appeals denied Petitioner's request for leave

to appeal (Ex. P).

<b>E.      <u>Petitioner's Federal Habeas Petition</u></b>

Petitioner filed his federal habeas Petition on June 8, 2007,[7] while his request for leave to

appeal the Appellate Division's denial of his *coram nobis* application was still pending before

the Court of Appeals.  (Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus by a Person

in State Custody, dated June 8, 2007 (Dkt. 1) ("Petition" or "Pet.").)  Construed liberally, the

Petition can be read to raise the following claims:  (1) the trial court's rulings during voir dire

violated Petitioner's *Batson* rights; (2) Petitioner was denied the effective assistance of counsel

at trial; (3) the evidence was not legally sufficient to support Petitioner's conviction of second-

---

[6] *Brady v. Maryland*, 373 U.S. 83 (1963), established that, under federal law, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.* at 87.  *People v. Rosario*, 9 N.Y.2d 286 (1961), established that, under New York law, a criminal defendant has a right to examine any prior statement of a witness called by the prosecution, where the prior statement relates to the subject matter of the witness' testimony.  9 N.Y.2d at 289-91, 213 N.Y.S.2d at 450-51.  The rule enunciated in *Rosario* was later codified as New York Criminal Procedure Law § 240.45(1)(a).

[7] Although the Court's docket reflects a filing date of July 25, 2007, a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the court, *see Houston v. Lack*, 487 U.S. 266, 270 (1988), and this Court will therefore deem the Petition to have been filed on June 8, 2007, the date when Petitioner declared under penalty of perjury that he delivered the Petition to prison authorities to be mailed to the Court, *see, e.g.*, *Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).

degree murder or third-degree criminal sale of a controlled substance; and (4) Petitioner's sentence was excessive. (*See id.*)[8]  In conjunction with the filing of his Petition, Petitioner requested a stay and abeyance while he exhausted state remedies. (*See id.*)  In an Order dated November 7, 2007, the Honorable Richard J. Sullivan, U.S.D.J., construed Petitioner's request as a motion for a stay pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), to enable him to exhaust ineffective assistance of appellate counsel claims in his pending *coram nobis* proceeding. (*See* Order, dated Nov. 7, 2007 (Dkt. 5).)  Judge Sullivan directed Petitioner to provide further information in support of his request for a *Rhines* stay (*id.*), which Petitioner then submitted on November 11 (Dkt. 6).

Subsequently, on December 4, 2007, the Court received a document from Petitioner entitled "On Petition for Habeas Corpus," which indicated that the Court of Appeals had denied Petitioner's request for leave, thereby exhausting Petitioner's ineffective assistance of appellate counsel claims. (Dkt. 7.)  On December 10, 2007, the Court denied Petitioner's request for a stay as moot, and construed the December 4 submission as a motion for leave to file an amended petition, asserting the newly-exhausted claims. (Dkt. 8.)  Finding that such claims would be timely, the Court granted the motion and directed Petitioner to file an amended petition, re-asserting the original grounds in his Petition, and asserting for the first time his newly-exhausted ineffective assistance of appellate counsel claims. (*Id.*)

Petitioner then filed his Amended Petition, which purports to incorporate his entire initial brief to the Appellate Division and portions of his supplemental brief to the Appellate Division,

---

[8] Although Petitioner did not attach any of the briefing from his direct appeal to his original Petition, the Court construes the enumerated claims in the Petition more broadly than might be suggested by the language of the "Grounds Presented" therein, in light of the related arguments made on Petitioner's direct appeal.

18

as well as his second letter requesting leave to appeal to the Court of Appeals.  Petitioner also

attached a document that he claims is a transcript of a telephone conversation between his

mother, Rosa Negron ("Negron"), and Chin's girlfriend, Joanne Soto ("Soto").[9]  Construed

broadly, the Amended Petition raises six grounds for habeas relief:

1. the trial court's rulings pursuant to *Batson* violated Petitioner's right to a fair trial (Am. Pet., at 6-47);

2. Petitioner was denied the effective assistance of counsel at trial in numerous ways (*id.* at 39-47);

3. the evidence was not legally sufficient to support Petitioner's conviction of second-degree murder (*id.* at 48-48-55);

4. Petitioner's sentence was excessive (*id.* at 56);

5. the evidence was not legally sufficient to support Petitioner's conviction of third-degree criminal sale of a controlled substance (*id.* at 56-60); and

6. Petitioner was denied the effective assistance of appellate counsel in numerous ways (*id.* at 61-65).[10]

On March 7, 2008, Respondent opposed the Petition by filing an Answer to Petition for Writ of

Habeas Corpus (Dkt. 11), together with a memorandum of law (Dkt. 13), an affidavit with

exhibits (Dkt. 12) and the transcripts of Petitioner's pretrial proceedings and trial (Dkts. 14-21).

On September 8, 2008, Petitioner filed a reply in further support of his Amended Petition.

---

[9] The trial court made a transcript of the tape recording, but sealed it for "security reasons."  (Trial Tr., at 3857.)  It is not clear how Petitioner obtained the supposed transcript he has presented to this Court.

[10] To the extent the Petition and the Amended Petition can be read to raise a claim that the prosecution committed a *Brady* violation by failing to disclose deals made with Chin in exchange for his testimony against Petitioner (*see* Am. Pet., at 51-55), the Court addresses that claim in the context of Petitioner's related ineffective assistance of counsel argument (*see* n.26 *infra*).

(Memorandum of Law in Support of Habeas Corpus Petitioner, dated Sept. 2, 2008 (Dkt. 24) ("Pet. Reply").)

On May 20, 2011, the Court directed the Respondent to serve and file a supplemental brief, as well as copies of any relevant records in Respondent's custody, possession or control, regarding Petitioner's claim that he was denied the effective assistance of counsel as a result of his attorney's failure to move to dismiss the third-degree drug sale charge under Section 40.40 of the New York Criminal Procedure Law, based on Petitioner's supposed prior conviction, on a guilty plea, of criminal trespass in the second degree, in violation of N.Y. Penal Law § 140.15. (Dkt. 26.)  On July 7, 2011, Respondent filed a supplemental brief, but did not submit any additional records.  (Dkt. 29.)  By letter dated July 13, 2011, Respondent informed the Court that he had requested records from the New York County Criminal Court, and expected a response in approximately one month.  (Letter to the Court from Matthew C. Williams, Esq., dated July 13, 2011.)  Respondent argued, however, that this Court should not consider such records as they were not part of the record before the state court.  (*See id.* (citing *Cullen v. Pinholster,* __ U.S. __, 131 S. Ct. 1388, 1398 (2011)).)  On July 27, 2011, Petitioner filed a response, together with a record from the New York State Department of Correctional Services, detailing Petitioner's arrest and arraignment for second-degree criminal trespass (a misdemeanor), and his subsequent guilty plea to trespass, in violation of N. Y. Penal Law § 140.05 (a violation). (Response to Opposition's Supplemental Memorandum of Law, dated July 27, 2011 (Dkt. 32).)

**DISCUSSION**

I.    **APPLICABLE LEGAL STANDARDS**

    A.    **Statute of Limitations**

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a habeas petition must be filed within a one-year limitations period beginning on the latest of four dates, usually "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A) (2000); *see also Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001) (citations omitted) (judgment becomes "final" for purposes of Section 2244 upon "the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner elects not to file a petition for certiorari – [the expiration of] the time to seek direct review via certiorari").[11] In this case, as set forth in more detail in the Court's December 10, 2007 Order (Dkt. 8), Petitioner's claims – including his newly-exhausted ineffective assistance of appellate counsel claims – are timely.

    B.    **Exhaustion**

A federal court may not consider a petition for a writ of habeas corpus unless the petitioner has exhausted all state judicial remedies. 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275 (1971); *Doresy v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997).

---

[11] The limitations period may alternatively begin to run on the following dates: (1) where the petitioner was prevented from filing an application by state action, the date on which the impediment is removed; (2) where the right asserted is a newly recognized one made retroactively applicable, the date on which the constitutional right asserted was initially recognized by the Supreme Court; and (3) the date on which the factual predicate of the claim presented could have been discovered through the exercise of due diligence. *See* 28 U.S.C. § 2244(d)(1)(B)-(D).

To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the "'opportunity to pass upon and correct alleged violations of . . . prisoners' federal rights." *Picard*, 404 U.S. at 275 (citing *Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)).  There are several ways by which a petitioner can fairly present a federal claim to the state appellate court, including by citing the relevant provisions of the federal Constitution in his appellate brief.  *See Davis v. Strack*, 270 F.3d 111 (2d Cir. 2001). Once the state courts are appraised of the constitutional nature of a petitioner's claims, the exhaustion requirement is fulfilled when those claims have been presented to "the highest court of the pertinent state."  *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (citation omitted).  A petitioner will be found to have satisfied this requirement where, with his letter seeking leave to appeal, he submits a copy of his brief to the lower appellate court, and the "fair import" of the total application suggests a request for review of the constitutional claims raised in that brief.  *Galdamez v. Keane*, 394 F.3d 68 (2d Cir. 2005).

## C.    <u>Standard of Review</u>

Where a federal constitutional claim has been adjudicated on the merits by the state court, this Court must accord substantial deference to the state court's decision under the standard of review dictated by AEDPA.  *See* 28 U.S.C. § 2254(d); *see also Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground").  The relevant section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the

22

> merits in State court proceedings unless the adjudication of the
> claim – (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d).  In addition, under AEDPA, where not manifestly unreasonable, a state

court's factual findings are presumed correct, and can only be overcome by "clear and

convincing evidence."  28 U.S.C. § 2254(e)(1).

Under AEDPA, a state court decision is "contrary to" clearly established federal law

where the state court either applies a rule that "contradicts the governing law" set forth in

Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a

[Supreme Court] decision" and arrives at a different result.  *Williams*, 529 U.S. 362, 405-06

(2000).[12]  An "unreasonable application" of clearly established federal law occurs when the state

court identifies the correct governing legal principle, but unreasonably applies that principle to

"a set of facts different from those of the case in which the principle was announced."  *Lockyer*

*v. Andrade*, 538 U.S. 63, 73-76 (2003).  The state court's decision, however, "must have been

more than incorrect or erroneous" –  rather, "[t]he state court's application must have been

'objectively unreasonable.'"  *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams*,

529 U.S. at 409).  In other words, the state court's ruling must have been "so lacking in

---

[12] The Supreme Court has emphasized that "clearly established [f]ederal law" refers only
to the "'holdings, as opposed to the dicta, [of the Supreme Court's] decisions as of the time of
the relevant state-court decision.'"  *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting
*Williams*, 529 U.S. at 412); *see also Rodriguez v. Miller*, 537 F.3d 102, 107 (2d Cir. 2007)
("*Musladin* admonishes courts to read the Supreme Court's holdings narrowly and to disregard
as dicta for habeas purposes.").  Thus, a principle of constitutional law "grounded solely in the
holdings of the various courts of appeals or even in the dicta of the Supreme Court" cannot
provide the basis for habeas relief.  *Rodriguez*, 537 F.3d at 106-07 (citing *Musladin*).

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 786-87 (2011).

Where the state court has not reached the merits of a petitioner's claim, then, to the extent this Court reviews the claim, it must do so under a *de novo* standard of review.

## II.     THE PETITION SHOULD BE DISMISSED.

### A.     Dismissal Would Be Appropriate Here, as Petitioner Has Presented a "Mixed Petition."

In this case, Petitioner has fully exhausted all of his *Batson* claims, as well as a number of the specific claims he now seeks to assert regarding the constitutional adequacy of his trial counsel, by raising those claims on his direct appeal to the Appellate Division, and then detailing them in his request for leave to appeal to the Court Appeals. (*See* Exs. D, H.) In addition, Petitioner has fully exhausted one of his claims regarding the adequacy of his appellate counsel – *i.e.,* his claim that his appellate counsel failed to raise certain *Rosario* and *Brady* claims on appeal – by asserting that claim in a state *coram nobis* proceeding, and then seeking leave to appeal to the Court of Appeals from the Appellate Division's denial of that claim. (Exs. K, N.)

Moreover, certain of Petitioner's claims, even if unexhausted, should be "deemed" to be exhausted for purposes of federal habeas review, given that Petitioner would no longer be able to pursue those claims in the state courts. *See Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991). Among these are Petitioner's two claims challenging the legal sufficiency of the evidence to support his convictions. Petitioner raised both of these claims on his direct appeal to the Appellate Division, but, as discussed further

below, he did not "fairly apprise" the Court of Appeals that he wished to pursue them before that court, as well.  (*See infra* at 47-48, 52-53.)  As both of the claims were capable of being raised on direct appeal, and as Petitioner cannot bring a second appeal, *see Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006), *cert denied*, 166 L. Ed. 2d 740 (2007); N.Y. Crim. Proc. § 440.10(2)(c), Petitioner would not now be able to return to the state courts to exhaust these claims.  The same is true with respect to Petitioner's claim that his trial counsel was ineffective for failing to seek dismissed the drug-sale charge for insufficient evidence, and his claim that his sentence was excessive.  As also discussed below (*see infra* at 43-46, 51-52), Petitioner again raised these claims before the Appellate Division, but failed to pursue them sufficiently, in seeking leave to appeal to the Court of Appeals.  Each of these claims should be considered procedurally barred as a result of being unexhausted and deemed exhausted (*see id*), but none render the Petition, as a whole, unreviewable.

There are, however, a number of additional claims that Petitioner has not exhausted and that should *not* be deemed exhausted by this Court, as Petitioner may still be able to return to the state courts to raise the claims there.  These claims include Petitioner's various claims for ineffective assistance of trial counsel that (a) Petitioner did not fairly raise to the Court of Appeals (*see infra* at 34-35), but (b) may be considered "outside" the trial record, and thus capable of review in a collateral post-conviction proceeding brought under Section 440 of the New York Criminal Procedure Law.[13]  Specifically, Petitioner may still be able to seek state review of his unexhausted claims that his trial counsel rendered ineffective assistance by failing

---

[13] Indeed, the Appellate Division noted that Petitioner had improperly tried to assert, on his direct appeal, claims that were "unreviewable on direct appeal because [they] involve[d] counsel's strategy and preparation, and other matters outside the record."  (Ex. F.)

to subpoena certain witnesses to testify at trial, by failing to move to dismiss a claim under the state mandatory joinder statute and by failing to move to sever the murder charge against Petitioner from the related charge against his co-defendant, Rodriquez. *See People v Rivera*, 71 N.Y.2d 705, 709 (1988) (explaining that, in general, an ineffective assistance of counsel claim based on trial counsel's failure to make a pre-trial motion cannot be decided on the trial record alone and thus should be raised in a Section 440 proceeding).

Petitioner has also presented several claims of ineffective assistance of appellate counsel that he has failed to exhaust in the state courts, but may still be able to raise there. Initially, Petitioner asserted no claims in this Court directed to the adequacy of his appellate representation, and he sought a stay of these proceedings so that he could exhaust such claims through a state petition for a writ of error *coram nobis*. As noted above, Petitioner then exhausted one such claim, but, when he subsequently amended his habeas Petition, he added many more challenges to his appellate counsel's conduct than he had raised in his *coram nobis* petition. Petitioner may still be able to exhaust his additional claims through a second *coram nobis* petition. *See People v. Bachert*, 69 N.Y. 2d 593 (1987); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."); *see also People v. D'Alessandro*, 13 N.Y.3d 216, 221 (2009) (reversing the Appellate Division's decision declining to review the merits of a second *coram nobis* application).

Petitioner's petition is accordingly a "mixed petition," in that it contains both exhausted claims and claims that remain unexhausted. *See Rhines v. Weber*, 544 U.S. 269 (2005). When ruling on a mixed petition, the Court may dismiss the entire petition, or, in its discretion, may

26

stay the proceedings and hold the petition in abeyance, so as to permit the petitioner to return to the state courts to exhaust any unexhausted claims, assuming an avenue for exhaustion is still available.  *See id.* at 277-78.  If, however, the petitioner has not shown good cause for his failure to exhaust any unexhausted claims, or if those claims are plainly meritless, then the issuance of a stay would be an abuse of the Court's discretion.  *See id.* at 277.  Where a court "determines that stay and abeyance is inappropriate, the court should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief."  *Id.* at 278.  Under AEDPA, the Court may also dismiss an unexhausted claim on the merits.  *See* 28 U.S.C. § 2254(b)(2); *see also, e.g., Aparicio v. Artuz*, 269 F.3d 78, 91 n.5 (2d Cir. 2001).

Here, if Petitioner's unexhausted claims were all meritless on their face, then this Court would recommend, despite Petitioner's failure to exhaust the claims, that the Court proceed to consider the claims and dismiss them on their merits, pursuant to 28 U.S.S. § 2254(b)(2). Certain of Petitioner's unexhausted claims, however, cannot be denied based on the record placed before this Court.  For example, this Court cannot determine from the present record whether Petitioner's trial counsel may have provided constitutionally ineffective representation by failing to move, under the state's mandatory joinder statute, to dismiss the drug-sale charge against Petitioner, based on the relation of that charge to an earlier trespass conviction that, according to Petitioner, arose from the same incident, on the same date, as the alleged drug sale. While trials on two separate charges would not constitute a federal double jeopardy violation, *see Garrett v. United States*, 471 U.S. 773, 790 (1985), Petitioner's trial on the drug-sale charge might have violated the state mandatory joinder law, and thus he might have had a viable motion to dismiss that charge – a motion that his trial counsel apparently failed to make.  Although

Petitioner has provided the Court with a record confirming the dates of his arrest, arraignment and guilty plea for trespass (*see supra* at 20), the Court still lacks sufficient information to evaluate this claim, as there is no testimony in the record of Petitioner's pre-trial or trial proceedings that explores the relationship between the purported trespass charge and the drug-sale charge.[14]  This Court is also not well-positioned to evaluate fully Petitioner's other unexhausted claims that challenge the potential strategy decisions made by his trial and appellate attorneys; the evaulation of such claims may require the introduction of testimony outside the record.

"[T]he interests of comity and federalism dictate that state courts must have the first opportunity to decide a petitioner's claims."  *Rhines*, 544 U.S. at 273 (citing *Rose v. Lundy,* 455 U.S. 509, 518-19 (1982)).  As certain of Petitioner's unexhausted ineffective assistance claims are not readily resolved on the record presented to this Court, the Court should not reach out to decide the merits of those claims, prior to any review by the state courts.

Under these circumstances, the Court is left with limited options.  As Petitioner has not shown, and apparently cannot show, good cause for his failure to exhaust all of his claims, it

---

[14] To have succeeded on a mandatory joinder motion, pursuant to Section 40.40 of the New York Criminal Procedure Law, Petitioner would have had to demonstrate, *inter alia*, (1) that the trespass and drug sale charges were based upon a single criminal transaction, *see* N.Y. Crim. Proc. § 40.40(1), (2)(a); *see also* N.Y. Crim. Proc. § 40.10 (defining a "criminal transaction" as "conduct which establishes at least one offense, and which is comprised of two or more or a group of acts either (a) so closely related and connected in point of time and circumstance of commission as to constitute a single criminal incident, or (b) so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture"); (2) that, at the time of Petitioner's alleged guilty plea to trespass, the prosecution possessed evidence legally sufficient to support a conviction of third-degree drug sale, N.Y. Crim. Proc. § 40.40(2)(b); and (3) that the court where the trespass charges were filed would have had jurisdiction over the drug-sale charge, *see People v. Lindsly*, 472 N.Y.S.2d 115 (2d Dep't 1984).

would be an abuse of discretion for this Court to stay these proceedings to enable Petitioner to exhaust them, at this juncture.  *See Rhines,* 544 U.S. at 277 ("Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court.").  Moreover, Petitioner has not even sought a stay so as to return to the trial court with a Section 440 motion, and, as set out above, he has *already* petitioned the Appellate Division once for *coram nobis* relief, and has made no apparent effort to do so again.

As staying these proceedings would be inappropriate, the only remaining option for the Court is to dismiss the entire Amended Petition without prejudice, although, as noted above, the Court should first afford Petitioner the opportunity to amend his Petition to excise the unexhausted claims, so that the Court could proceed to decide his exhausted claims.  On the assumption that Petitioner would prefer the Court to consider the majority of his claims, rather than dismiss the entire Petition outright and risk being barred from raising any of those claims again in federal court,[15] this Court will proceed to consider the remainder of the claims.  S*ee Reyes v. Morrissey*, No. 07 Civ. 2539 (LAP) (DF), 2010 WL 2034531, at *9 (S.D.N.Y. April 21, 2010) (Report and Recommendation), *adopted by* 2010 WL 2034527 (S.D.N.Y. May 19, 2010) (where *Rhines* stay would be inappropriate, presuming that petitioner would prefer the Court to analyze the exhausted claims, but noting that petitioner should inform the Court if he preferred to have the entire petition dismissed as a mixed petition); *Taylor v. Poole,*

_____

[15] Even if Petitioner's exhausted claims were dismissed "without prejudice," it is likely that he would be unable to return to this Court thereafter, as the applicable statute of limitations would presumably have run.  *See Duncan v. Walker,* 533 U.S. 167, 181 (2001) (holding that the pendency of a federal habeas action does not toll the statute of limitations); 28 U.S.C. § 2241(c).

No. 07 Civ. 6318 (RJH) (GWG), 2009 WL 2634724, at *25, n.11 (Aug. 29, 2009) (Report and Recommendation) (same).  As can be seen from the analysis below, however, the claims that Petitioner has duly exhausted (or that should be "deemed" exhausted) are not cognizable, are procedurally barred or are without merit, and thus, in any event, the Petition should be dismissed.

### B.   Even if the Petition Were Amended to Delete the Unexhausted Claims, the Petition Should be Dismissed.

The claims that Petitioner has fully exhausted, or that should be deemed exhausted for purposes of federal habeas review, are as follows:

### 1.   Claimed *Batson* Violations

Petitioner challenges the trial court's *Batson* rulings, specifically, that the defense's challenges to white male prospective jurors were for improper discriminatory purposes, but that the prosecution's challenges to Hispanic and African-American prospective jurors were not for improper discriminatory purposes.  (Am. Pet., at vi.)  Additionally, Petitioner challenges the process by which the trial court addressed the parties' *Batson* objections.  (*Id*.)  Petitioner presented the constitutional nature of his *Batson* claims in his supplemental brief on direct appeal.  (*See* Ex. D.)  The Appellate Division rejected the claims on the merits, *People v. Chu*, 808 N.Y.S.2d 179, and Petitioner exhausted these claims by raising them in both of his letters seeking leave to appeal to the Court of Appeals (*see* Exs. G and H).  Accordingly, the Court reviews these claims under the standard of review set forth in AEDPA.  *See* 28 U.S.C. § 2254(d).

Under the Equal Protection Clause, the prosecution may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's race, ethnic origin, or gender.  *Batson*, 476 U.S. at 84 (race); *Hernandez v. New York*, 500 U.S. 352 (1991) (ethnic

origin); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994) (gender).  In *Batson*, the Court

established a three-part burden-shifting analysis for determining whether a prosecutor has

impermissibly excluded jurors based on race.  First, the defendant must "establish a *prima facie*

case of purposeful discrimination in selection of the petit jury solely on evidence concerning the

prosecutor's exercise of peremptory challenges at the defendant's trial."  *Id.* at 96.  To establish a

*prima facie* case, the defendant must show that:  (1) "he is a member of a cognizable racial

group," (2) "the prosecutor has exercised peremptory challenges to remove from the venire

members of the defendant's race,"[16] and (3) "these facts and any other relevant circumstances

raise an inference that the prosecutor used that practice to exclude the veniremen from the petit

jury on account of their race."  *Id*.  To meet this initial burden, a defendant must show that "the

totality of the relevant facts gives rise to an inference of discriminatory purpose."  *Johnson v.

California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 93-94).

     Once the defendant has established a *prima facie* case, "the burden shifts to the State to

come forward with a neutral explanation for challenging [the] jurors."  *Batson*, 476 U.S. at 97.

For example, a prosecutor may strike jurors for reasons such as their "negative experience with

law enforcement, age, life experience, type of employment, and demeanor."  *See Jordan v.

Lefevre*, 206 F.3d 196, 200 (2d Cir. 2000).  The prosecutor may provide any explanation, as long

as it is "based on something other than" the juror's membership in the protected class.

*United States v. Freisel*, 224 F.3d 107, 120 (2d Cir. 2000) (quoting *Hernandez v. New York*,

500 U.S. 352, 360 (1991)).  The proffered explanation need not be "persuasive, or even

_____

[16] In *Powers v. Ohio*, the Supreme Court, eliminated the requirement that the challenged
jurors be of the same race as the defendant.  499 U.S. 400, 415-16 (1991).

plausible," and "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (internal quotation marks and citation omitted).

Finally, the "[t]rial court . . . will have the duty to determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 98. This is a factual determination, that turns, *inter alia,* on the trial court's assessment of the prosecutor's credibility. *See Hernandez*, 500 U.S. at 365 (internal citations omitted); *see also United States v. Moore*, 4 F. Supp. 2d 319, 321-22 (S.D.N.Y. 1998) ("No credibility findings are required at either of the first two stages of the three-step *Batson* analysis," but once "both sides carry their respective *prima facie* burdens, then the Court is permitted to become a fact-finder and rule on the ultimate question of violation of equal protection.").

In this case, Petitioner's *Batson* challenges relate not only to the state courts' denial of his claim that the prosecution had engaged in unlawful discrimination in selecting the jury, but also to the state courts' treatment of the *prosecution's* "reverse-*Batson*" claim, by which the prosecution had accused defense counsel of discrimination, as well. Petitioner's challenge to the trial court's ruling on the prosecution's claim is not, however, cognizable on federal habeas review. Essentially, Petitioner must ground his argument on the fact that he was denied his right to exercise his own peremptory challenges as he saw fit, but, to the extent he had such a right, it arose out of New York state law, not the federal constitution. Accordingly, he cannot seek a remedy through federal habeas. *See Machicote v. Ercole*, No. 06 Civ. 13320 (DAB) (JCF), 2008 WL 169348, at *12 (S.D.N.Y. Jan. 18, 2008) ("[D]istrict courts within the Circuit have uniformly held that a state court ruling sustaining a reverse-*Batson* challenge may not be reviewed on habeas corpus because there is no constitutional right to peremptory challenges.")

32

(compiling cases); *see also Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas

review, a federal court is limited to deciding whether a conviction violated the Constitution,

laws, or treaties of the United States.") (citations omitted).

As for Petitioner's *Batson* claim regarding the alleged discriminatory conduct of the

prosecution, it should first be noted that, in the context of a habeas proceeding commenced by

Petitioner's co-defendant Rodriquez, another magistrate judge of this Court (the Honorable

Andrew J. Peck) analyzed the trial court's *Batson* rulings – the precise rulings at issue here – and

concluded that the trial court's rulings were proper.  *See Rodriguez*, 2004 WL 503451, at *30-38.

As a result, Judge Peck further concluded that the Appellate Division's decision upholding those

*Batson* rulings was neither contrary to, nor an unreasonable application of, established federal

law, under AEDPA.  *See id*.  As this reasoning (which was adopted in its entirety by the

Honorable Loretta A. Preska, *see Rodriguez*, No. 03 Civ. 3314 (LAP), Order, dated July 7, 2004

(Dkt. 37)) was not only thorough and persuasive, but rested on the exact same facts presented

here, I recommend that Judge Peck's reasoning in *Rodriguez* be adopted here, as well.[17]

Accordingly, I recommend that Petitioner's *Batson* claims be dismissed.

---

[17] To the extent Petitioner in this case raises any *Batson-related* arguments that were not
addressed in the *Rodriguez* case, they are without merit.  Petitioner argues that the trial court
improperly delayed ruling on *Batson* motions, prompted the prosecution to raise *Batson*
objections, created a "circus-like" atmosphere, improperly selected two jurors as a remedy for
the defense's *Batson* violations and empaneled a race-conscious jury.  Yet Petitioner has
not identified – nor has this Court found – any holdings in Supreme Court cases establishing any
right that would be violated by these particular alleged defects.  Thus, the state court cannot be
said to have violated any "clearly established Federal law, as determined by the Supreme Court
of the United States."  28 U.S.C. § 2254(e)(1); *see also* n.12 *supra*; *Musladin*, 549 U.S. at 741.

## 2.      **Ineffective Assistance of Trial Counsel Claims**

The right to counsel in criminal prosecutions is grounded in the Sixth Amendment.

Because the Constitution "envisions counsel playing a role that is critical to the ability of the

adversarial system to produce just results[,] . . . 'the right to counsel is the right to the effective

assistance of counsel.'" *Strickland*, 466 U.S. at 685-86 (1984) (quoting *McMann v. Richardson*,

397 U.S. 759, 771 n.14 (1970)).  Counsel can deprive a criminal defendant of this right "simply

by failing to render 'adequate legal assistance.'" *Id.* at 686 (citation omitted).

In order for counsel to be deemed constitutionally "ineffective," however, counsel's

conduct must have "so undermined the proper functioning of the adversarial process that the trial

cannot be relied on as having produced a just result." *Id*.  Thus, to prevail on an ineffective

assistance claim under *Strickland*, a criminal defendant must show that:  (1) his counsel's

performance "fell below an objective standard of reasonableness," and (2) "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Id*. at 688, 694.  A court may reject an ineffective assistance of counsel claim

for failure to satisfy either prong of the *Strickland* standard, without reaching the other.  *See id*.

at 697.  ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

prejudice, which we expect will often be so, that course should be followed.").

### a.      **Extent To Which Petitioner Has Exhausted Claims Directed To the Performance of His Trial Counsel**

As a preliminary matter, the Court has carefully examined the papers Plaintiff submitted

to the state courts on his direct appeal, in an attempt to ascertain which of his ineffective

assistance of trial counsel claims should be considered exhausted, and which remain

unexhausted.  Certainly, Petitioner raised a number of such claims in his brief to the Appellate

34

Division.  Further, when those claims were rejected, Petitioner's counsel, on Petitioner's behalf, wrote to the Court of Appeals, seeking leave to appeal, enclosing the Appellate Division briefs, and expressly stating that Petitioner was seeking review of the Appellate Division's ruling that he had "received effective assistance of counsel under both state and federal standards." (Ex. G.)

That first letter, however, did not specify whether Petitioner wished to pursue all of his various ineffective assistance claims, or only certain of them.  Had Petitioner not said anything further, a fair reading of his letter would have been that he wished to pursue all of those claims. *See Morgan v. Bennett*, 204 F.3d 360 (2d Cir. 2000) (finding claim exhausted where, in his initial leave letter, the petitioner explicitly requested consideration of all claims raised in his briefs to the Appellate Division).  Petitioner's lengthy follow-up letter to the Court of Appeals, however, altered such a reading.  In that second letter – which Petitioner had requested leave to file so as to "set forth [his] arguments in full" (Ex. G), Petitioner, through counsel, went on to detail several of his ineffective assistance claims, but omitted any reference to others (*see* Ex. H, at 10-11).  Under these particular circumstances, it cannot be said that the Court of Appeals was fairly apprised that Petitioner wished to proceed not only with the ineffective assistance claims that he set out with specificity in the second letter, but also additional claims that he never mentioned there.  *Cf. Jordan v. Lefevre*, 206 F.3d 196, 198 (2d Cir. 2000) ("Arguing a single claim at length and making only passing reference to possible other claims to be found in the attached briefs does not fairly apprise the state court of those remaining claims." (citing *Grey*, 933 F.2d at 120)).

b.    **Exhausted Claims**

Petitioner fully exhausted several claims directed to the adequacy of his trial counsel, including claims that trial counsel was ineffective for (i) failing to raise the supposed lack of evidence to corroborate accomplice testimony regarding Petitioner's involvement in the murder, (ii) failing to cross-examine witnesses effectively at trial, (iii) making prejudicial references to the Mafia in summation and (iv) failing to prepare for trial, to gain a satisfactory understanding of the case and to pursue a consistent trial strategy.  (*See* Am. Pet., at 39-47 (incorporating by reference Pet. App. Br., at 48-59).)  With respect to each of these claims, which are addressed in turn below, Petitioner raised his arguments both in his brief to the Appellate Division, on direct appeal (*see* Pet. App. Br., at 48-59), and also detailed them in his second letter to the Court of Appeals, seeking leave to appeal (Ex. H).

Moreover, the Appellate Division denied Petitioner's ineffective assistance claims on substantive grounds, "to the extent the existing record permit[ted] review."  *People v. Chu*, 808 N.Y.S.2d 179.  For purposes of determining the appropriate standard of review on federal habeas, this should be considered a resolution "on the merits."  *See Diaz v. Conway,* No. 04 Civ. 5062(RMB), 2008 WL 2461742, at *21 (S.D.N.Y. June 17, 2008) (finding that the Appellate Division had rejected the petitioner's ineffective assistance of trial counsel claims on the merits, for AEDPA purposes, where the court had found that the claims involved matters outside the record and, thus, would require a Section 440.10 motion, but that, to the extent the record permitted review, the claims were without merit).  Accordingly, this Court reviews Petitioner's exhausted ineffective-assistance-of-trial-counsel claims under the deferential standard of review set out in AEDPA.  *See id.*; *see also* 28 U.S.C. § 2254(d).

### i.      **Failure To Raise Lack of Corroboration**

Petitioner claims that his trial counsel was ineffective for failing to raise the lack of corroborating evidence as to the murder charge.  (See Pet. App. Br., at 40-48, 50.)  Section 60.22 of the New York Criminal Procedural Law precludes conviction based on accomplice testimony alone, requiring that the prosecution also introduce independent evidence "tending to connect" the defendant to the crime.  N.Y. Crim. Proc. § 60.22[1].  An "accomplice" is defined as one who, "according to the evidence adduced in such action, may reasonably be considered to have participated in:  (a) [t]he offense charged; or (b) [a]n offense based upon the same or some of the same facts or conduct which constitute the offence charged."  N.Y. Crim. Proc. § 60.22[2].  The New York Court of Appeals has explained that, while paragraph (b) expanded the definition of "accomplice" beyond its common law meaning, "there remains the requirement that the alleged accomplice be in some manner implicated in, and possibly subject to, prosecution" for the same crime or for the conduct constituting the charged crime.  *People v. Dorta*, 46 N.Y.2d 818, 820 (1978).

In this case, the trial court charged the jury as to the accomplice corroboration rule. Specifically, the trial court instructed the jury that Chin, Tony, Doobie, Arenas, Morales, Ramel Cruz, Julio Alicea, Rosa and Davis were accomplices to the drug conspiracy, and Chin and Tony were accomplices to William's murder.  (Trial Tr., at 4137-38.)  The trial court then explained, in relevant part, that:

> A defendant [can]not be convicted o[f] an offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense.  . . .  And an accomplice cannot be corroborated by testimony from another accomplice.  . . .

In order for you to determine whether to give any weight to the accomplice testimony, you should do two things; first, put aside the accomplice's testimony given here in court; second, turn to the consideration of the other evidence.

Under the tests that I've given you, such other evidence standing alone, as I stated before, must tend to connect the particular defendant with the commission of the particular crime in such a way that may reasonably satisfy you that the accomplice is telling the truth.

. . . .

If you find such other evidence insufficient to satisfy the required test, then, obviously, you must disregard entirely the testimony of the accomplice.  In other words, if you find such other evidence sufficient, then you should consider the testimony of the accomplice, together with all the other evidence in the case, in making your final determination of the guilt or lack of guilt as to each defendant considered separately.

(*Id*. at 4138-41.)

While the testimony of Chin and Tony, as accomplices in William's murder, would not have been sufficient to support Petitioner's conviction under the accomplice corroboration rule (as properly explained by the trial court in its jury charge), the testimony of other Crew members, who were accomplices in the narcotics conspiracy, but were in no way implicated in William's murder, was sufficient to connect Petitioner to that murder.  *See People v. Bresser*, 96 N.Y.2d 136, 147 (2001) ("The accomplice status of a witness with respect to one charge in a criminal transaction does not necessarily render that person an accomplice with respect to other charges."); *People v. Green*, 760 N.Y.S.2d 839 (1st Dep't 2003) (noting that there was no need for an accomplice corroboration jury instruction in connection with the second-degree murder charge because, although the "witness was part of the drug-selling operation, there was no evidence that she was an accomplice to the murder").

38

For example, as described in more detail above, Davis and Arenas corroborated testimony about the initial dispute between William and the Crew (Trial Tr., at 1118, 1126-30, 1903-08); Morales confirmed that Petitioner was angry about William's transgressions and vowed that William would "get his" (*id*. at 2228, 2302-05, 2317); Davis testified that, after the robbery in which Petitioner was victimized, Petitioner began carrying a gun and said he "want[ed] to get" William (*id*. at 1908-14); and Arenas, Doobie and Davis testified that, after the murder, Petitioner was trembling, had altered his appearance and made statements suggesting first-hand knowledge of the crime (*id*. at 1137-39, 1922-24, 2850-53, 2904-09).  As, based on the evidence at trial, none of these witnesses were implicated in William's murder, and as their testimony tended to connect Petitioner to William's murder, a defense based on the accomplice corroboration rule would not have been successful.  Consequently, counsel cannot be said to have been objectively unreasonable in failing to raise the issue.  *See United States v. Nersesian*, 824 F.2d 1294, 1322 (2d Cir. 1987) ("Counsel certainly is not required to engage in the filing of futile or frivolous motions.").

Petitioner also appears to argue that his counsel should have objected to the jury charge on the ground that the trial court should have clarified that, if, under the accomplice testimony rule, the jury found the corroborating evidence insufficient, it had to acquit on that charge.  (*See* Pet. App. Br., at 47-48.)  This Court, however, does not accept that the trial court's instructions were "confusing," as Petitioner suggests.  The trial court explained that accomplice testimony alone is not sufficient to support a conviction, and that, if the jury were to find that the corroborating evidence did not  "tend to connect" the particular defendant with the particular charged crime, then the jury would be required to disregard any accomplice testimony.  Based on these instructions, the jury would have understood that, if it found no evidence other than Chin's

39

and Tony's testimony that tended to connect Petitioner to William's murder, then it would have

had to acquit.  In any event, because, as explained above, the corroborating testimony was

sufficient, Petitioner cannot show that he was prejudiced by his counsel's failure to object to the

charge.  For these reasons, Petitioner's first ineffective assistance claim is without merit under

*Strickland*, and the Appellate Division's decision rejecting the claim was neither contrary to, nor

an unreasonable application of clearly established federal law.  *See* 28 U.S.C. § 2254(d);

*Harrington*, 131 S. Ct. at 788 (*Strickland* is clearly established federal law).  The claim should

therefore be dismissed.

### ii.      Failure To Cross-Examine Witnesses Effectively

Petitioner also raises a challenge to his trial counsel's alleged failure to cross-examine

Chin or Tony effectively.  As to Chin, Petitioner contends that, on cross-examination, trial

counsel should have explored Chin's plea deal (*i.e.*, a sentence of 25 years to life in exchange for

testifying truthfully), which Chin had disclosed on direct examination.  (*See* Pet. App. Br., at 52-

53.)  The attorney for Petitioner's co-defendants, however, cross-examined Chin at some length

about his plea agreement.  As a result, on cross, Chin testified that he was aware that he could

have faced a term of 75 years to life, that the trial judge had a reputation as being "very harsh" in

sentencing, particularly on violent crimes, and that, as a term of his cooperation agreement, the

district attorney would determine whether Chin had testified truthfully.  (Trial Tr., at 3496-98.)

Likewise, as to the cross-examination of Tony, Petitioner argues that his trial attorney failed to

impeach Tony on the basis of inconsistencies in his testimony, but concedes that co-defendant

Rodriguez's attorney "tested [Tony's] memory and accuracy."  (Pet. App. Br., at 55.)

As Petitioner's counsel may well have coordinated with the three other defense attorneys

to avoid repetition, the Court cannot conclude that he was objectively unreasonable for failing to

cover the same ground during his cross-examination.  *See United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature.").  In any event, as the relevant facts were heard by the jury, Petitioner cannot demonstrate that he suffered the prejudice necessary to prevail on an ineffective assistance claim, under *Strickland*. For these reasons, Petitioner's complaints regarding his counsel's cross-examination of Chin and Tony are without merit, and the Appellate Division's rejection of this claim should not be disturbed, under AEDPA.

### iii.    References to the Mafia During Summation

Petitioner further claims that he was deprived of the effective assistance of counsel when his trial attorney suggested to the jury that he (the attorney) had a family connection to the Mafia.  (*See* Pet. App. Br., at 52.)  The references in question, however, were used to make arguments on behalf of Petitioner.  For example, Petitioner's counsel attempted to discredit Rosa, by saying that Rosa was the kind of person who would steal coins from a beggar, which, according to counsel, even the Mafia would not condone.  (*See* Trial Tr., at 3941.)  Regardless of whether these comments were in poor taste, they apparently reflected a considered trial strategy and cannot support a *Strickland* claim.  *See McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999) (noting that "actions or omissions that might be regarded as sound trial strategy do not amount to ineffective assistance"); *United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir. 1999) (same).  Thus, Petitioner cannot demonstrate that the Appellate Division's rejection of this claim was contrary to, or based on an unreasonable application of federal law.  28 U.S.C. § 2254(d).

### iv.    Failure To Prepare for Trial, To Understand
### the Case, or To Pursue a Consistent Trial Strategy

Petitioner also claims that his trial counsel – who was appointed just three and a half weeks before trial – was unprepared for trial, was overwhelmed by the breadth and depth of the trial, was confused about both facts and legal concepts, and failed to set forth a consistent defense theory.  (*See* Pet. App. Br., at 48-52, 55-57.)  By way of example, Petitioner notes that, in opening, counsel merely argued that the prosecution's witnesses were all unreliable, as they were accomplices and cooperators.  (*See id.,* at 50; *see also* Trial Tr., at 23-26)

Yet, from a review of the record, it appears that counsel's strategy to challenge the credibility of the prosecution's witnesses was sound – in fact, Petitioner has not suggested any alternative strategy.  Petitioner's counsel consistently pursued the credibility theory:  explaining, in his opening argument, that the cooperating witnesses were not credible and would distort their testimony to "save their own necks" (Trial Tr., at 23-26); exploring Peter Chin's credibility during cross-examination (*id*. at 3501-59); cross-examining numerous witnesses on the aspects of their testimony involving Petitioner (*see, e.g.*, *id*. at 332-63, 505-06, 659-50, 682-715,1070-77, 1317-40, 1492-1525, 1931-50, 2284-2316, 2612-44, 2736-39, 2881-911); and, in summation, raising credibility issues, including attacking the cooperating witnesses (see, e.g., id. at 3834-37, 3941-43, 3946-48, 3950-54, 3957-59, 3963-67).  Although Petitioner complains that his lawyer failed, in summation, to reiterate that Chin was testifying "to save his neck" (Pet. App. Br., at 52), counsel did mention that Chin had "signed a cooperation agreement" and was to be sentenced accordingly (*id*. at 3954).

Petitioner also argues that his attorney's strategy changed over the course of the trial, particularly in terms of how he approached Chin's testimony.  On direct examination, Chin

testified that Petitioner was with him at the time of William's murder and that Petitioner knew what was going to happen.  Petitioner complains that, while his counsel made no effort to impeach Chin's credibility through cross-examination, counsel nonetheless went on to argue in summation that Chin had lied on direct.  (*See* Pet. App. Br., at 53; *see also* Trial Tr., at 3171-73.) Yet trial counsel may have had sound strategic reasons not to question Chin as to Petitioner's knowledge and participation in William's murder, as Chin may well have reiterated the incriminating statements he made on direct examination, thereby emphasizing them for the jury.

Finally, this Court has reviewed the trial proceedings and finds that, "[c]onsidering the totality of the circumstances, at the time, and assessing trial counsel's representation as a whole, it cannot be said that trial counsel's representation of the petitioner was objectively unreasonable such that the petitioner was denied the effective assistance of counsel."  *Cotto v. Lord*, No. 99 Civ. 4874 (JGK), 2001 WL 21246, at *17-18 (S.D.N.Y. Jan. 9, 2001) (noting need to view trial counsel's representation "as a whole").  Indeed, Petitioner was acquitted on one count of criminal sale of a controlled substance.

Overall, none of the above ineffective assistance claims can succeed under AEDPA, and these claims should all be dismissed as without merit.

### c.        Claim That May Be Deemed Exhausted

Another claim that Petitioner raised before the Appellate Division was that his trial counsel was ineffective for failing to move to dismiss the criminal drug sale count based on lack of proof.  (*See* Pet. App. Br., at 59.)  Although, by omitting any reference to this claim in his second letter to the Court of Appeals, Petitioner failed to exhaust this claim, the claim should be deemed exhausted, as it is based solely on the legal sufficiency of the evidence of record. Having abandoned such a claim on his direct appeal, Petitioner now has no procedural recourse

43

to the state courts to pursue the claim.  *See Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991).[18]

When, however, a claim is deemed exhausted because of a procedural bar, "the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default," *Gray v. Netherland*, 518 U.S. 152, 162 (1996) (citations omitted); *accord Carmona v. United States Bureau of Prisons*, 243 F.3d 629, 633 (2d Cir. 2001) (citations omitted), or that "failure to consider the [defaulted] claim will result in a fundamental miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (internal quotation marks and citations omitted).  In this instance, Petitioner cannot satisfy either standard.

Generally, "cause" for a procedural default is established when "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  More specifically, cause for a default exists where a petitioner can show that (1) "the factual or legal basis for a claim was not reasonably

---

[18] As already noted (*see supra* at 25), Petitioner was only entitled to a single direct appeal.  *See Jimenez*, 458 F.3d at 149 (finding that remedies in New York State courts were no longer available because "[petitioner] has already taken his one direct appeal, and [his] claim is procedurally barred from consideration in a collateral attack on his conviction").  Moreover, given that the claim could have been brought on the basis of the trial record, Petitioner is foreclosed from raising this particular claim collaterally in a Section 440 motion.  *See* N.Y. Crim. Proc. § 440.10(2)(c) (barring collateral review of claims that could have been raised on direct appeal).  Nor can Petitioner seek state review of this claim pursuant to either a state writ of habeas corpus, *see People ex rel. Allah v. Leonardo*, 565 N.Y.S.2d 331 (3d Dep't 1991) (state writ of habeas corpus unavailable where claim could have been raised on direct appeal) (citations omitted), or a writ of error *coram nobis*, *see People v. Gordon*, 584 N.Y.S.2d 318 (2d Dep't 1992) (*coram nobis* relief only available for claims of ineffective assistance of appellate counsel) (citation omitted).  Accordingly, Petitioner can no longer exhaust his claim in the state courts.

available to counsel," (2) "'some interference by state officials' made compliance [with the procedural rule] impracticable," or (3) "the procedural default is the result of ineffective assistance of counsel." *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) (internal citation omitted). "Prejudice" requires Petitioner to demonstrate that the alleged constitutional error worked to Petitioner's "*actual* and substantial disadvantage." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). Here, Petitioner has not shown any "cause" for his failure to raise this particular ineffective assistance of counsel claim in his second letter to the Court of Appeals, and, as he has not demonstrated cause for his procedural default, this Court need not reach the question of whether he can show prejudice. *See Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985) ("Since a petitioner who has procedurally defaulted in state court must show both cause and prejudice in order to obtain federal habeas review, we need not, in light of our conclusion that there was no showing of cause, reach the question of whether or not [petitioner] showed prejudice.").

Nor has Petitioner demonstrated a sufficient probability that this Court's failure to review his defaulted claim would result in a "fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Coleman*, 501 U.S. at 750). This exception to the procedural bar is quite narrow; it is "concerned with actual as compared to legal innocence." *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992). To meet this standard, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Carrier*, 477 U.S. at 496. "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "Without

45

any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Id.* at 316. "The petitioner thus is required to make a stronger showing than that needed to establish prejudice." *Id*. at 327 (citations omitted). It is extremely rare that a petitioner will be able to satisfy the actual innocence standard. *See id.* at 324 ("in virtually every case, the allegation of actual innocence has been summarily rejected." (citation omitted)). In this case, while Petitioner contends that he was convicted of crimes he did not commit (Dkt. 33), Petitioner has not submitted any new evidence showing that he is actually innocent.[19] Accordingly, Petitioner cannot overcome the procedural bar to this Court's review of his claim challenging his trial counsel's failure to seek dismissal of the drug-sale count, and the claim should be dismissed.

---

[19] Although Petitioner asserts a claim in this habeas proceeding that the evidence was legally insufficient to support his conviction of second-degree murder or third-degree criminal sale of a controlled substance, these claims, even if meritorious, would not be sufficient to support a finding of "actual innocence." *See Sweet v. Bennett*, 353 F.3d 135, 142 (2d Cir. 2003); *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002); *Garbutt v. Conway*, 05 Civ. 9898 (SHS), 2009 WL 2474099, at *3 (S.D.N.Y. Aug. 12, 2009); *Edwards v. Fischer*, 414 F. Supp. 2d 342, 352-53 (S.D.N.Y. 2006); *but see Dixon v. Miller,* 293 F.3d 74, 81 (2d Cir. 2002) (acknowledging that actual innocence "'means factual innocence, not mere legal insufficiency,'" but still finding that the determination of actual innocence "depends on the evidence at trial and its sufficiency").

### 3.    Insufficiency of the Evidence as to Second-Degree Murder

Petitioner claims that the evidence adduced at trial was legally insufficient to support his conviction for second-degree murder.  (*See* Am. Pet., at 48-60.)[20]  This claim, which Petitioner raised, through counsel, on his direct appeal, was rejected by the Appellate Division as unpreserved.  *People v. Chu*, 808 N.Y.S.2d 179.  Petitioner then listed this claim in his first letter seeking leave to appeal to the Court of Appeals, although he omitted it from his second letter.  (Exs. G, H.)  Thus, as with Petitioner's last ineffective assistance claim discussed above, this claim should be regarded as abandoned, and thus unexhausted.  It should also, similarly, be deemed exhausted, given that the claim could have been exhausted through Petitioner's direct appeal and is not otherwise reviewable, at this point, in the state courts.  Further, as Petitioner

---

[20] To the extent Petitioner argues that the verdict against him was not supported by the "weight of the evidence" (*see* Am. Pet, Grounds Presented, Point III), this Court cannot consider his claim.  A "weight of the evidence" claim is grounded in state law, and thus is not cognizable on habeas review.  *See People v. Bleakley*, 69 N.Y.2d 490, 492-95 (1987) (explaining state-law basis for a "weight of the evidence" claim); *see also, e.g., Douglas v. Portuondo*, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002) ("A federal habeas court cannot address 'weight of the evidence' claims because . . .  the 'weight of the evidence' argument is a pure state law claim . . . for which habeas review is not available.") (internal citations omitted).  Petitioner's claim, however, may also be liberally construed as a federal constitutional claim, challenging the legal sufficiency of the evidence.

has again demonstrated no basis for overcoming the resulting procedural bar,[21] the claim should be dismissed on that ground.

In any event, even if the fact that Petitioner raised the claim in his first letter to the Court of Appeals were considered sufficient to have exhausted this claim,[22] Petitioner's legal insufficiency claim would also be procedurally barred as a result of the Appellate Division's reasoned decision rejecting the claim as unpreserved at trial.  *See People v. Chu*, 808 N.Y.S.2d 179.  This Court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citing *Fox Film Corp. v. Muller*, 296 U.S. 207, 210 (1935)).  "This rule applies whether the state law ground is substantive or procedural."  *Id.*

---

[21] Petitioner asserts that, to the extent this particular claim was not adequately exhausted, the failure can be attributed to ineffective assistance of appellate counsel.  (*See* Pet. Reply, at 1.) This argument for "cause" fails, however, because, Petitioner has not exhausted such an ineffective assistance argument before the state courts.  Thus, Petitioner cannot rely on it as a basis to excuse his procedural default.  *Taylor v. Mitchell*, 939 F. Supp. 249, 255 (S.D.N.Y. 1996) ("While ineffective assistance of counsel may constitute a cause for procedural default, the exhaustion doctrine "requires that a claim of ineffective assistance be presented to state courts as an independent claim before it may be used to establish cause for a procedural default" in the context of a petition for a federal writ of habeas corpus." (quoting *Murray*, 477 U.S. at 489)).

[22] Unlike Petitioner's ineffective assistance claims (where Petitioner addressed some, but not all, of those claims in detail in his second letter to the Court of Appeals), Petitioner simply failed to address the insufficiency claim at all in his second letter.  Thus, if the second letter to the Court of Appeals is understood as a supplement to the first letter, then, arguably, the Court of Appeals would have been sufficiently apprised of the insufficiency claim by its inclusion in the first letter.  *See Morgan*, 204 F.3d at 371 (holding that a claim exhausted, where the petitioner had raised that claim in an initial letter requesting leave to appeal, even though the claim was not addressed in a second letter providing "supplemental" argument on other claims).

To determine whether the state law ground on which the state court rested was "truly an *independent* basis for [the] decision or merely a passing reference, such reliance on state law must be clear from the face of the opinion." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (emphasis added) (internal quotation marks and citation omitted); *see also Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) (explaining that, "in order to preclude federal review, the last state court to render judgment must clearly and expressly state that its judgment rested on a state procedural bar") (internal quotation marks and citation omitted).  To be deemed *adequate*, the state procedural rule on which the court's decision was based must be a rule that is "firmly established and regularly followed" by the state in question, *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991), and that has not been "misapplied in [the petitioner's] case in particular," *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (internal quotation marks and citations omitted); *see also Garvey v. Duncan*, 485 F.3d 709, 714 (2d Cir. 2007) (the relevant inquiry is whether "the state rule at issue . . . is firmly established and regularly followed"); *Monroe v. Kuhlman*, 433 F.3d 236, 241 (2d Cir. 2006) (holding that a state procedural bar is "adequate" if it "is firmly established and regularly followed by the state in question" in the specific type of circumstances presented) (citation omitted).

By expressly holding that Petitioner had failed to preserve his claim that the evidence adduced at trial was legally insufficient to support his conviction of second-degree murder, the Appellate Division made clear, from the face of its decision, that it was relying on the state-law preservation requirement as its basis for rejecting this claim.  Thus, the Appellate Division's rejection of this claim rested on an "independent" state ground.  *See Fama*, 235 F.3d at 809.[23]

---

[23] The mere fact that the Appellate Division also held that, were it to review this aspect of Petitioner's claim, it would find it to be without merit, *People v. Chu*, 808 N.Y.S.2d 179, does

Moreover, the state procedural rule at issue is firmly established in New York state law and regularly followed, and hence provided an "adequate" basis for the court's decision. The federal courts have repeatedly held that the denial of an appeal for failure to raise the issue at trial represents the application of a "firmly established and regularly followed" state law. *See, e.g., Salcedo v. Artuz*, 107 F. Supp. 2d 405, 413 (S.D.N.Y. 2000) (failure to object to jury instructions was an independent and adequate state ground for the appellate court's rejection of the claim); *see also Velasquez*, 898 F.2d at 9 (New York's "contemporaneous objection" rule was adequate and independent state ground); *Wainwright v. Sykes*, 433 U.S. 72 (1977) (federal habeas claim is not cognizable where the petitioner waived it procedurally in the state court).[24]  Further, Petitioner has not shown that the state procedural rule in question was misapplied in his case in particular. *See Cotto*, 331 F.3d at 240.

Accordingly, the state-law ground on which the appellate court decided Petitioner's sufficiency of the evidence claim was both independent and adequate to support the court's decision, precluding federal habeas review. Petitioner cannot overcome this procedural bar, as he has not demonstrated "cause" for his failure to preserve the claim. Although Petitioner suggests that his trial counsel was ineffective for failing to preserve this claim at trial (Pet.

---

not alter the fact that the claim is procedurally barred, *see Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) (where a state court expressly relies on a procedural default in rejecting the claim, but also notes that it would reject the claim on the merits as well, federal habeas review remains procedurally barred).

[24] Under New York law, a defendant must make a timely objection before the trial court in order to preserve that objection for appellate review. *See* N.Y. Crim. Proc. § 470.05(2) ("For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same."); *see also People v. Balls*, 69 N.Y.2d 641, 642 (1986); *People v. Newton*, 644 N.Y.S.2d 708, 709 (1st Dep't 1996).

Reply, at 1), Petitioner cannot rely on this argument because he did not independently present it to the state court, *see Taylor*, 939 F. Supp. at 255.  Nor, for the same reasons discussed above, has Petitioner demonstrated that the Court's failure to review this claim would result in a fundamental miscarriage of justice.  (*See supra* at 45-56.)

For all of these reasons, I recommend that Petitioner's claim that the evidence was legally insufficient to support his conviction of second-degree murder be dismissed as procedurally barred.

### 4.    Excessive Sentence

Petitioner raised his claim that his sentence was excessive as compared to cooperating accomplices (*see* Am. Pet. at 48 and attached Pet. App. Br., at 63-65) to the Appellate Division on direct appeal.  Petitioner then abandoned this claim by failing to raise it in either of his letters requesting leave to appeal to the Court of Appeals.  Thus, this claim is unexhausted.  As the claim could have been exhausted on direct appeal, however, it represents yet another claim that should be deemed exhausted and procedurally barred, and the claim should be dismissed on that basis.

Moreover, Petitioner's claim, as framed, is not cognizable on federal habeas review.  In order to state a federally cognizable excessive sentence claim, a petitioner must generally allege that the statute under which he was sentenced is itself unconstitutional, under the Eighth Amendment.  *See United States v. Dawson*, 400 F.2d 194, 200 (2d Cir. 1968) ("when a statute provides for punishment thought to be violative of the [Eighth] [A]mendment the constitutionality of the statute itself must be attacked") (citations omitted).  In this case, Petitioner has made no such attack on the validity of the relevant statute.

In the absence of a challenge to the relevant statute itself, an excessive sentence claim may only be maintained if the sentence imposed fails to comply with state law. *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law.") (citation omitted). Here, Petitioner was convicted of Murder in the Second Degree, pursuant to N.Y. Penal Law § 125.25[1]; Conspiracy in the Second Degree, pursuant to N.Y. Penal Law § 105.15; and Criminal Sale of a Controlled Substance in the Third Degree, pursuant to N.Y. Penal Law § 220.39[1]. By these statutes' terms, second-degree murder is a Class A-I felony, while second-degree conspiracy and third-degree drug sale are both Class B felonies; carrying maximum sentences, in turn, of life imprisonment and 25 years. *See* N.Y. Penal Law §§ 70.02(a), (b). Petitioner's sentence for these crimes of, respectively, 25 years to life, eight and one-third years to 25 years and eight and one-third years to 25 years, fell within the ranges permitted by state law, as did his aggregate sentence of 41 and two-thirds years to life. Accordingly, no Eighth Amendment issue is implicated by his sentence.

### 5.    Insufficiency of the Evidence as to Third-Degree Criminal Sale of a Controlled Sentence

While Petitioner raised his claim based on insufficiency of the evidence as to his conviction of third-degree drug sale on direct appeal to the Appellate Division, he failed to exhaust the claim by raising it in either of his two letters requesting leave to appeal to the Court of Appeals.[25] The claim is thus unexhausted, and should be deemed exhausted, as Petitioner no longer has any available mechanism for seeking review of this claim in the state courts. For the

---

[25] As explained above (*see* n.20 *supra*), to the extent Petitioner argues that the verdict against him was not supported by the "weight of the evidence," such a claim is not cognizable on habeas review. *See Douglas*, 232 F. Supp. 2d at 116.

same reasons explained in connection Petitioner's other claims that this Court has deemed

exhausted, the claim is procedurally barred.  (*See supra* at 43-45.)

Furthermore, even if Petitioner's insufficiency of the evidence claim were somehow

considered exhausted, it would nevertheless be procedurally barred, because the Appellate

Division rejected this claim as "unpreserved," which, as discussed above, constitutes an

independent and adequate state law ground for its decision, precluding federal habeas review.

(*See supra* at 48-51.)  As Petitioner has not shown that he can overcome his procedural default,

this claim should be dismissed.

### 6.      Ineffective Assistance of Appellate Counsel

In his Amended Petition, Petitioner contends that his appellate counsel was ineffective

for failing to raise a claim on direct appeal based on what he terms "prosecutorial misconduct."

(Am. Pet. at 61.)  Construed broadly, Petitioner's claim suggests that his appellate attorney

should have raised the following separate claims and sub-claims:  (1) that the evidence was not

legally sufficient to support Petitioner's conviction of second-degree conspiracy; and (2) that the

prosecution, in violation of *Brady* and *Rosario*, failed to produce (a) a surveillance videotape,

which detectives claimed showed co-defendant Rodriguez and Petitioner to be engaged in some

type of illegal activity; (b) notebooks of Detective Scott Pendergast; (c) prior indictments against

Rosa; and (d) evidence that the prosecution put improper pressure on and/or made undisclosed

deals with Chin and Rosa in exchange for their allegedly false testimony implicating Petitioner

in William's murder.  (*See id.* at 61-65.)

Through his state *coram nobis* proceeding, Petitioner exhausted only the last of these

claims – *i.e.*, that Petitioner's appellate counsel rendered ineffective assistance by failing to

raise, on direct appeal, a claim that the prosecution should have produced evidence that it had

either pressured Chin and Rosa to testify against Petitioner and/or had entered into improper deals with these witnesses to obtain incriminating testimony.  (*See* Ex. K, at 6-7; *see also* Ex. N (seeking leave to appeal to the Court of Appeals).)  As Petitioner could still seek state *coram nobis* review of his other, unexhausted claims (*see supra* at 26), these claims cannot be deemed exhausted here.  As already discussed, the Court will therefore assume that Petitioner would wish them excised from the Amended Petition, and the Court will only consider Petitioner's single, exhausted claim.  (*See supra* at 27-30.)  As the Appellate Division rejected this claim on the merits (Ex. M), this Court will consider it under the AEDPA standard of review.  *See* 42 U.S.C. § 2254(d).

Under the *Strickland* test (which applies to appellate counsel, as well as trial counsel, *see Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992)), a petitioner may demonstrate that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).  A federal or a state-law claim that was improperly omitted from an appeal may form the basis for an ineffective assistance of appellate counsel claim, "so long as the failure to raise the . . . claim fell outside the wide range of professionally competent assistance."  *Id.* (quotations omitted).  Nonetheless, appellate counsel does not have a duty to advance every available non-frivolous argument on appeal.  *See Jones v. Barnes*, 463 U.S. 745, 754 (1983).  Deference is accorded to an appellate counsel's strategic decision to focus an appeal on select issues, instead of raising every potentially "colorable" claim.  *Id.*, 463 U.S. at 753-54.  This is because "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues."  *Id.* at 751-52.  A brief that raises every colorable claim

"runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions."  *Id.* at 753 (citations omitted).

In this instance, Petitioner has absolutely no basis for grounding an ineffective assistance claim on his appellate counsel's failure to raise a *Rosario* violation, as, even assuming that Chin or Rosa had made statements regarding their purported deals with the prosecution, such statements – which would relate solely to their credibility at trial – would not be considered *Rosario* material under state law.  *See People v. Coker,* 521 N.Y.S.2d 96, 97 (2d Dep's 1987) (explaining that a prior statement by a witness that "reflected on the witness's credibility," but "did not relate to the subject matter of his testimony," does not constitute Rosario material).

Further, while impeachment evidence can constitute *Brady* material, *see United States v. Bagley,* 473 U.S. 667, 676 (1985), Petitioner merely speculates that *Brady* material was withheld in this case.  As to Chin, the defense was aware that Chin was offered a sentence of 15 years to life (as opposed to 75 years to life) in exchange for his cooperation.  (*See* Pet. App. Br., at 18 (citing Trial Tr. 3082-83, 3228, 3302, 3495, 3510-11).)  Beyond this, Petitioner points only to the tape recording of a telephone conversation between Negron and Soto (*see supra* at 19) as evidence that the prosecution pressured Chin to provide false testimony regarding Petitioner's involvement in William's murder.  The trial court found this tape recording, which was produced by Hernandez's attorney shortly after both the prosecution and defense had rested, to have been "a setup," "totally unreliable," and "highly incomprehensible."  (Trial Tr., at 3843 (finding that the recording was "just the last straw in a long line of attempts to fix this case").)  These factual findings of the state court must be presumed correct under ADEPA, in the absence of clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1).  As Petitioner has not, in this proceeding, presented clear and convincing evidence that the tape recorded conversation was, in

fact, reliable, he has no basis to suggest that Chin's testimony was actually coerced by the prosecution through threats, much less that the prosecution failed to produce evidence of some type of illicit deal.

With respect to Rosa, while there were delays in the prosecution's production of materials relating to Rosa's prior criminal proceedings (materials that had been requested by counsel for one of Petitioner's co-defendants), it appears that the prosecution did eventually produce those materials, prior to Rosa's cross-examination.  (*See, e.g.,* Trial Tr., at 1831-32.) Moreover, although the trial court directed the prosecution to investigate whether, as part of its agreement with Rosa, it had agreed not to seek an indictment of Rosa on the conspiracy charges brought against numerous members of the Crew, including Petitioner (*see id.* at 1468), Petitioner has not pointed to anything in the record suggesting that the prosecution ultimately failed to turn over any such evidence.  Nor has Petitioner introduced any evidence to support a claim that Rosa was pressured by the prosecution, in any way, to provide false testimony at trial.

At bottom, Petitioner can only speculate that the supposed undisclosed *Brady* information even existed.  For this reason, he cannot demonstrate that his *Brady* claim would have had merit, *see Mallet v. Miller*, 432 F. Supp. 2d 366, 377 (S.D.N.Y. 2006) (in habeas context, finding no merit to *Brady* claim based on "the mere speculation that exculpatory evidence was withheld"); *United States v. Upton*, 856 F. Supp. 727, 746 (E.D.N.Y. 1994) ("As a matter of law, mere speculation by a defendant that the government has not fulfilled its obligations under [*Brady*] is not enough to establish that the government has, in fact, failed to

56

honor its discovery obligations."), and thus he cannot show that his appellate counsel was unreasonable for failing to advance such a claim.[26]

Appellate counsel cannot be found to have acted unreasonably for omitting a claim which had no likelihood of success on appeal, and a petitioner cannot be prejudiced as a result of appellate counsel's failure to raise meritless claims.  *See Mayo*, 13 F.3d at 534 ("To establish prejudice in the appellate context, a petitioner must demonstrate that there was a reasonable probability that [his] claim would have been successful.") (internal quotation omitted). Accordingly, the Appellate Division's rejection of Petitioner's ineffective assistance of appellate counsel claim, on *coram nobis,* was neither contrary to, nor an unreasonable application of, *Strickland*, and the claim should be dismissed.  *See* 28 U.S.C. § 2254(d).

## CONCLUSION

For the foregoing reasons, I recommend that the Amended Petition either be dismissed in its entirety as a "mixed petition" containing exhausted or unexhausted claims, or, alternatively (at Petitioner's option), that Petitioner's unexhausted claims that are still capable of review in the state courts be deemed excised from the Amended Petition, and the remainder of Petitioner's claims be dismissed as either non-cognizable, procedurally barred, or without merit, as set out above.

---

[26] To the extent Petitioner may now be seeking to state an independent *Brady* claim (*see* Am. Pet., at 48, 51), the Court notes that Petitioner never exhausted such a claim, either on direct appeal or through any collateral post-conviction proceeding.  As such a claim would presumably rest on evidence outside the trial record, Petitioner (should he actually have any non-speculative evidence that *Brady* material was actually withheld), may still be able to raise the claim in a state Section 440 motion.  Accordingly, as the claim is unexhausted, but still potentially capable of being exhausted, any such claim should be deemed excised from the Amended Petition, for the reasons discussed above.  (*See supra* at 25-30.)

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan, United States Courthouse, 500 Pearl Street, Room 640, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Hermann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
        August 9, 2011

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

<u>Copies to</u>:

Hon. Richard J. Sullivan, U.S.D.J.

Mr. Charles Chu
98-A-5710
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

Mark Ryan Dwyer, Esq.
New York County District Attorney's Office
1 Hogan Place
New York , NY 10013